IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KIT HOWELL, JR.,

                    Plaintiff,


        vs.                              Case No. 10-2273-JTM


FEDEX GROUND PACKAGE SYSTEM, INC.,
                    Defendant.



MEMORANDUM AND ORDER

        This is an action by plaintiff Kit Alvin Howell, Jr., a former employee of FedEx Ground

Package System, Inc., against FedEx for malicious prosecution and the tort of outrage or intentional

infliction of emotional distress. Howell was terminated by FedEx following an investigation into

missing lottery tickets in a package shipped by the Kansas Lottery, and FedEx subsequently

forwarded the results of its investigation to the Shawnee County Police Department. The state

prosecutor then brought charges against Howell, but dismissed them prior to trial. Howell also

brought a claim for wrongful termination, which was subsequently dismissed. (Dkt. 43). The matter

is now before the court on the defendant's Motion for Summary Judgment. (Dkt. 41).

        The standards for summary judgment are time-honored and well-known.  Summary judgment

is proper where the pleadings, depositions, answers to interrogatories, and admissions on file,

together with affidavits, if any, show there is no genuine issue as to any material fact, and that the

moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P.  56(c).  In considering a

motion for summary judgment, the court must examine all evidence in a light most favorable to the

opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988).  The party moving

for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable

doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

The findings of fact adopted by the court exclude requested findings of fact which are not supported by any particularized reference to admissible evidence.

### Findings of Fact

Howell began working for FedEx as a package handler in Shawnee, Kansas on February 12, 2007. His duties included unloading trucks and trailers. FedEx fired Howell on May 22, 2008 after an investigation and interview of Howell regarding missing lottery tickets. Howell admitted to handling the tickets, and FedEx concluded Howell had taken them.

The Kansas Lottery subsequently signed a criminal complaint, and the City of Shawnee prosecutor filed a criminal action against Howell for theft on July 17, 2008.

Howell asserts two claims against FedEx — malicious prosecution and intentional infliction of emotional distress.

Howell underwent FedEx's package handler training when he was hired. He also received and signed the company's Theft Policy, which provides that "Theft is something the company cannot and will not tolerate." Howell also underwent training on how to handle damaged packages, and understood that failure to comply with FedEx's policies on theft was grounds for discipline up to and including termination.

On May 21, 2008, as Howell worked a shift from 2:15 p.m. to 11:00 p.m., FedEx's dock service manager, Ryan Lougee, instructed Howell to unload a trailer. This trailer contained Kansas lottery ticket shipments. The tickets are shipped in boxes secured by plastic wrap to pallets. Inside each box are packs of lottery tickets which are individually wrapped and which contain a tracking number.

The same day, an independent contractor, Jim Bingaman, reported to Gary Hamilton, FedEx's Senior Manager, that he found packs of lottery tickets in an empty trailer which he had inspected for hook-up. Hamilton took possession of eight packs of tickets, and contacted Security Specialist, J.B. Hamblin. Hamblin contacted the Kansas Lottery and determined that three packs of tickets were missing from the shipment.

The next day, Hamblin asked for the names of the unloaders assigned to the trailer. Lougee told Hamblin that only two unloaders, Robert Randolph and Kit Howell, were assigned to the trailer. Hamblin first met with Randolph for about fifteen or twenty minutes. Randolph said he had unloaded the first quarter or half of the trailer, but specifically denied seeing any lottery tickets, ripped or holed boxes, or any open packages.

Howell reported for work at 2:15 p.m. on May 22, and around 3:20, he was removed from his shift so that he could speak with Hamblin. Howell had never met Hamblin before. Howell accompanied Hamblin to Hamblin's office and Hamblin recorded his interview of Howell with Howell's knowledge.

3

During Hamblin's May 22 interview of Howell, Howell admitted to handling the eight packs of lottery tickets which were found inside the trailer.

Hamblin:     And I showed you a package, a plastic bag containing eights packs of lottery tickets, and you advised me that you placed those in the trailer, is that correct?

Howell:     Yes sir.

Howell admitted to setting the lottery tickets inside of the trailer instead of placing them back in the box in which they were shipped:

… I didn't tell anybody that there's packages of them in the trailer, I should have just picked them up, all of them up, and put them back in the box and sat them outside and put them in, in them, those black tubs. Cause they told us anything that gets loose, put them in the tubs so they can be replaced and put back in the box and I didn't do that.

As to the eight packs of lottery tickets found in the trailer, Howell said: "Yeah, I meant to go in the back and pick those up." However, Howell told Hamblin that he placed the box which contained packs of lottery tickets outside the trailer and that box ultimately made it to its destination, stating "I did take them out of the trailer, put them to the side where, I thought somebody like one of those tape guys, ah one of those tapers come out there and tape it up. I don't know if anybody seen me put them there."

Hamblin told Howell, "Why if you put the box of lottery tickets to the side, why did you leave eight loose items in the trailer? That doesn't make any sense[,] Kit."  During the interview, Howell agreed he had left packs of lottery tickets inside the trailer:

Hamblin:  You found other loose items of lottery tickets and you left them in the belly of the trailer, hidden underneath pallets stacked, so when you finished unloading the trailer[.]

Howell:     Uh huh.

Howell testified that, on May 21, when he was finished unloading the trailer, he went to the restroom, and when he returned, the trailer door was down. Howell testified he then went to unload another trailer. Howell states that he told Lougee when he went to the restroom that he was not done

unloading the trailer, but it is uncontroverted that Howell did not tell Lougee that there was a damaged package in the trailer.

Hamblin told Howell that although eight packs of lottery tickets were found in the trailer, three packs of lottery tickets were still missing.

As Howell acknowledged in his deposition, he gave three different versions during his interview of how the box came open.

Hamblin:   How did the box become open?

Howell:   I, I, I dropped it. Not on purpose like that, you know, I'm trying, you know, cause I, I can't remember if I had more than one in my hand, I don't remember how heavy the boxes …

At another part of the interview, Howell indicated that the box had been ripped open:

Hamblin:   I'm asking you how did you open the box? You didn't drop it to open it, how did you open it? Did you have a knife cutter?

Howell:   No, it ripped off, by the tape, by the tape wrapper.

Hamblin:   By the tape wrapper?

Howell:   Yeah. Cause I'm trying to tape wrap this stuff on the brown boxes and it rips open.

During another portion of the interview, Howell indicated that there was a hole in the box:

Howell:   … I do remember seeing them tickets and I do remember when I took them out of the trailer, because they was a hole in them.

Hamblin:   A hole in what?

Howell:   The box, the box that the tickets were in. It, I'm trying to remember if they was ripped off.

Hamblin:   Okay. We're going to go over the dry erase board here. First story was dropped the box, tickets came out. Next story, ripped on the tape.

Howell:   inaudible.

Hamblin:   Next story, hole in the box. Since we've been in here, you've told me three different ways that box got opened. Well, they, that doesn't make sense.

Howell:   The last one, I do remember that one.

| | |
|---|---|
| Hamblin: | That's the truth now? Okay. That one's the truth. We've determined that the third one is now the truth. So the first two stories you told me, if this one's the truth, this one's the lie. Is that right? Yes, no? |
| Howell: | Yes. |

Howell also said that the box was already open when he entered the trailer. Howell testified he told Hamblin that he saw "a couple of them [lottery tickets] on the floor before I even came in there." From the recording of the interview:

| | |
|---|---|
| Howell: | But I did see a couple of them on the floor before I even came in there. But I didn't see anybody stealing anything or taking anything, but I did take out. |
| Hamblin: | Okay, hang on a minute. Let's back up. Now you're saying that when you got into the trailer you saw the lottery tickets on the floor. |
| Howell: | Uh huh. |

During the interview, Howell acknowledged that, while working for another employer, he had taken something without paying for it. Howell told Hamblin, "I took some, well I didn't steal it, I took something without paying for it."

Howell concedes he did not report the damaged box of lottery tickets on May 21 to anyone at FedEx, even though he understood it was important to notify someone if there was a damaged package.

At the conclusion of the interview, Hamblin told Howell he thought he was lying. Howell then told Hamblin:

| | |
|---|---|
| Howell: | You want me to find them, I'll go find them for you. |
| Hamblin: | Where are you going to find them? Tell me where you're going to find them. Let's, can you walk to them right now? |
| Howell: | No, but I can go search for them. |
| Hamblin: | That's not what I asked. Where are you going to go and search for them? If you can, let's go and get them right now. We can end this right now. Do you know where they are at and we can go and get them? Probably? |
| Howell: | The only place I can think of is my car. |

Hamblin concluded that Howell's story was evasive, inconsistent and that Howell had implicitly admitted to taking the tickets. Howell was told he was terminated and escorted from the premises.

Other than Hamblin, who investigated the missing tickets, Howell identified one other package handler, Randolph, and one contract driver, Jim Bingaman, as having access to the lottery tickets. Howell also identified Ryan Lougee, "Shift Sort Manager", who, according to Howell, removed the lock from the trailer door in which he was working, and Gary Hamilton, who took possession of the tickets found by Bingaman.

Despite his later testimony that the box of lottery tickets was already damaged or open when he entered the trailer, on May 28, 2008, Howell sent an e-mail to FedEx's human resources department which provided the following written account to FedEx as to how the box of lottery tickets came open:

> I explained, I tore plastic and picked up 16 boxes at a fast pace they were heavy, I unloaded them onto the conveyor belt, the last box slipped from my hand when it hit the floor the box busted on the bottom side some of the tickets spilled out I picked them and put the damaged box along with all the loose tickets that I seen and put them off to the side of the wall inside of the trailer to keep unloading packages....

This e-mail account does not mention anywhere the alternative story that Howell saw lottery tickets already on the floor when he first entered the trailer.

On May 27, Hamblin met with officer Hahne of the Shawnee Police to report a possible theft, and gave him a copy of his report, along with a recording of his interview of Howell. It is uncontroverted that the report identified the precise portion of the recording where Hamblin believed Howell had admitted to taking the lottery tickets

> Howell's admission to being able to find the missing three (3) packs of the lottery tickets is heard at 46:16 on the digital recording between me and him. Howell states, "If you want me to go find 'em, I'll go find 'em for you ya." Then, at 46:53, Howell states, "The only place I can think of is in my car." As mentioned above, the lottery tickets were not recovered inside Howell's vehicle.

Hamblin also told Hahne that Howell had sent a May 23 e-mail to FedEx in which he recanted his confession to the theft. Officer Hahne did not ask for a copy of the e-mail.

7

Hahne has testified that he has no reason to believe that any of the information in Hamblin's report is false. He is not aware of Howell submitting any documents to the Shawnee police to support his side of the story. Hahne testified that, "I wrote the report and was going to assume that a detective would take over the investigation from there."

After the intake of the initial report by Hahne, the case was assigned to Detective Sergeant Jodi Andrews for investigation. Andrews described the process from report to complaint as follows: "Officer Hahne, which would be patrol, would respond to receive the allegation from the victim, determine whether or not it met the criteria or elements of the theft, creates the report which then gets assigned to investigations for followup." She further testified: "If the suspect doesn't respond in a reasonable amount of time, I just forward the complaint and let the prosecutors review the case to see where to go from there."

The Shawnee Police Department prepares the report which is then forwarded to the prosecutor.

On June 3, Detective Sergeant Jodi Andrews and Detective Mendoza went to Howell's home. Howell did not answer the door, and a "door hanger" was left asking Howell to contact Sergeant Andrews. Howell concedes he was at home on June 3, 2008 when Andrews and Mendoza came to his home. Howell testified, "I remember them ringing the door bell, but after that, I tried to go to the door but there wasn't nobody there."

The next day, Andrews received a voice mail from Howell leaving his telephone number. Andrews called the number and received no answer, but left a voice mail for Howell to contact her.

Eight days later, on June 12, 2008, Howell left two voice mail messages, provided his cell phone number and stated that he wanted to talk to Andrews because he had not done anything wrong. Andrews called the cell phone number and left a message for Howell to contact her.

Although Howell initially testified that Andrews never called him back, Howell concedes he did not call Andrews:

Q.   … Do you recall receiving a message from, I believe it's Sergeant Andrews?

A.   Yes.

Q.   And did you contact Sergeant Andrews back in response to her voicemail message on June 12th?

A.   No.

As of June 18, Howell had not returned her call, so Andrews prepared a report and complaint and forwarded it to the prosecutor. She had testified that she did not talk to Howell because he never called her back, going on to add that had Howell come in for an interview and named other people to interview, she would have followed up on those leads as well. She stated she did not listen to the CD of the interview provided by Hamblin to the Shawnee police, but that "I would have listened to it had I interviewed Mr. Howell." Andrews testified that, had Howell called her back, she could have done followup investigation. She admits that Hamblin told the Shawnee police about Howell's e-mail, but that she does not recall requesting a copy of the e-mail from Hamblin.

Officer Hahne, who took the report and recording from Hamblin, also did not listen to the recording provided by Hamblin. Hahne thought somebody else "above the chain" might listen to it.

 On July 2, 2008, Andrews spoke to Paul Schliffke, security agent for the Kansas lottery. Schliffke told Andrews that the Kansas Lottery would assist in the prosecution of the theft of lottery tickets, and that he would forward a copy of his report, which was placed in the case file.

 Because Andrews was moving to another department, Detective Sergeant Lynch wrote the complaint against Howell. On July 8, 2008, the city prosecutor approved the complaint against Howell, and the complaint was signed by Paul Schliffke for the Kansas Lottery Commission.

Neither Hamblin nor any other representative of FedEx signed the complaint against Howell. (Plt. dep. 108; Ex. 11) 75. The complaint which was filed by the City of Shawnee prosecutor does not state that Howell admitted to taking the missing three packs of lottery tickets, rather it states Howell admitted to setting aside the 8 packs that were recovered:

> To wit; The suspect was an employee at FedEx. He unloaded trailers, and one of the trailers was from the Lottery. The suspect opened a box of lottery tickets, took 11 packs of tickets, 8 were recovered, 3 were still missing. The suspect admitted to setting aside the 8 packs that were recovered.

Other than Hamblin providing his report and audio to the Shawnee police, Howell does not have any reason to believe that Hamblin had any involvement in the decision of the City of Shawnee to file criminal charges against him.

The victim, the Kansas Lottery, is the party who ultimately had to sign the complaint to initiate the prosecution.

The prosecuting attorney makes the decisions as to whether prosecution is initiated, and whether there is probable cause to go forward with a complaint.

On August 4, 2009, the day the case was set for trial, the Shawnee City prosecutor dismissed the case against Howell. The prosecutor testified she is sure that Hamblin believed that Howell had confessed to taking the lottery tickets. She chose not to proceed with the case because there was a question as to whether she could prove guilt beyond a reasonable doubt.

When asked why he believes FedEx acted intentionally to cause him harm, Howell testified, "He [Hamblin] – he – he lied on me as a package handler." He believes FedEx "lied" because of the statements contained in Hamblin's report and because Howell disagrees with Hamblin's report to the extent it interprets the audio tape.

Howell alleges in his Amended Complaint that he suffered "mental pain, fright, humiliation, embarrassment, and nervousness." He described the alleged emotional suffering as, "I just feel real hurt on the inside, that I want to be on my own again, I want to be able to take care of my son the way I need to, myself. I could have lost custody of my son behind it."

On July 22, 2008, Howell was evaluated by Dr. William Reece who opined that Howell demonstrated "no evidence of mental illness or severe emotional disorder." Howell agrees that, as of October of 2008, he had no history of depression, never has had any suicidal thoughts, has no problems with appetite or sleep, had no problems with anxiety or anger control, had no symptoms of any other type of psychological problems, had not been prescribed any psychotropic medication, and has no medical difficulties.

***Conclusions of Law***

***A. Malicious Prosecution***

A claim for malicious prosecution under Kansas law requires proof that (1) the defendant initiated, continued, or procured a criminal action, (2) the defendant did so without probable cause; (3) the defendant acted with malice; (4) the proceedings terminated in favor of the plaintiff, and (5) the plaintiff sustained damages. *Arceo v. City of Junction City*, 182 F.Supp.2d 1062, 1087 (D. Kan. 2002). Because malicious prosecution actions "have long been disfavored in the law," courts presented with such claims "must construe the scope of the tort narrowly in order to protect litigants' right of access to the judicial process." *Good v. Bd. of County Comm'rs of Shawnee*, 331 F.Supp.2d 1315, 1328 (D.Kan. 2004).

Here, Howell's claim of malicious prosecution fails as to multiple elements of the tort. First, the evidence does not establish that FedEx initiated the criminal proceeding. Under Kansas law,

> merely reporting facts to a law enforcement officer who then deems a crime to have been committed and directs the defendant's arrest is not sufficient to establish this element … Persons supplying information to a public prosecutor will not be liable for malicious prosecution when the prosecutor initiates criminal proceedings, if the person supplies all the information available to the informant through diligent effort.

*Arceo*, 182 F.Supp. at 1087-1088 (citing *Nelson v. Miller*, 227 Kan. 271, 279, 607 P.2d 438 (1980)).

For purposes of the tort of malicious prosecution, the act of providing evidence to a prosecutor is insufficient for the element of initiation, if "the decision to prosecute is left entirely to the uncontrolled discretion of the prosecuting officer, or if the officer conducts an independent investigation" *Id*. at 1088 (citing *Slavens v. Crossman*, Case No. 86-1347, 1989 U.S. Dist. LEXIS 7803 (D.Kan. June 14, 1989)). The person supplying evidence "initiates" a resulting prosecution only if that person "made an exercise of the prosecutor's discretion impossible by providing knowingly false information upon which the prosecutor based his decision." (*Id*.)

The Restatement takes a similar viewpoint.

> When a private person gives to the prosecuting officer information that he believes to be true, and the officer in the exercise of his uncontrolled discretion initiates criminal proceedings based upon that information, the informer is not liable under the Rule stated in this Section even though the information proves to be false and his

11

belief was one that a reasonable man would not entertain. The exercise of the officer's discretion makes the initiation of the prosecution his own and protects from liability the person whose information or accusations has led the officer to initiate the proceedings.

RESTATEMENT (SECOND) OF TORTS § 653 cmt. g (1976). *See also Hunt v. Dresie*, 241 Kan. 647 (1987) ("advice of a prosecuting attorney as to the institution of a criminal proceeding sought and acted upon in good faith, is a complete defense for malicious prosecution," so long as "all of the facts known to the defendant have been fully and truthfully given to such official").

In the present case, the uncontroverted evidence precludes a finding that FedEx initiated the prosecution against Howell. Hamblin made a report to the Shawnee Police Department, attaching a compact disc containing the entirety of his interview with Howell. None of the information in Hamblin's report was known to be false. For reasons of its own — primarily Howell's active avoidance of speaking with Shawnee police officers — the police department ultimately forwarded the case for prosecution without any attempt to independently review the recording. The prosecutor then independently reviewed the file and chose to file charges. The complaint was signed by the Kansas Lottery, not FedEx. Absolutely nothing about the case suggests that FedEx effectively forced the prosecutor to file charges against Howell.

Even if FedEx had somehow initiated the criminal complaint against Howell, summary judgment would be appropriate because FedEx acted with probable cause in making its report to the Shawnee police. Probable cause is an independent element of a malicious prosecution claim. *Stohr v. Donahue*, 215 Kan. 528, 530 (Kan. 1974). Under Kansas law, probable cause exists if "there are reasonable grounds for suspicion, supported by the circumstances sufficiently strong in themselves to warrant a cautious or prudent person in the belief that the party committed the act of which he or she is complaining." *Nelson v. Miller*, 227 Kan. 271, 277 (1980). Whether probable cause exists must be viewed in the light of the facts and circumstances present at the time the defendant reported the suspected criminal activity to the police. *Stohr*, 215 Kan. at 530.

At the time that Hamblin reported the incident involving the lottery ticket to the police, FedEx knew (1) a box of lottery tickets from one of its trailers had been opened, and three packets

12

of tickets were missing, (2) one of the two unloaders assigned to the trailer directly and unequivocally denied any knowledge about any lottery tickets, (3) Howell, the other unloader, admitted handling and (supposedly accidentally) opening the box of lottery tickets, (4) Howell also admitted to knowingly violating company policies by failing to immediately alert his supervisors to the opened box, (5) Howell gave inconsistent stories during his interview (and in a later e-mail) as to how the box became open, and whether it was already opened and tickets were loose in the trailer at the time he first entered it, (6) after the investigator stated he believed Howell was lying, Howell indicated that they could find the missing tickets, suggesting they might be found in his car. The court has independently reviewed the recording of interview, and finds that they would warrant a reasonably prudent person in the belief that Howell was responsible for the missing tickets.

In his Response, Howell notes that FedEx employees exit the facility through a Guard Shack, where they are subject to a search, and that he was able to leave the facility on May 21 without any lottery tickets being found. (Resp. at ¶ 8). He avers that in his Response that the lottery ticket box "was already open and appeared to have been damaged." (*Id*. at ¶ 10). When he unloaded the rest of the trailer, he "dropped one of the boxes and it came open and spilled some of the packets of lottery tickets." (Id. at ¶ 11). He further states that "Hamblin ... questioned [him] for a long time and [he] was tired, scared, and confused." (Id. at ¶ 16).  He now suggests that as many as sixteen other people might have had access to the trailer containing the lottery tickets. (Id. at ¶ 28).

But the employees are only subject to pat down and the tickets might have escaped notice. Similarly, his story of finding the tickets is inconsistent with his statements to Hamblin. And while other workers may have also had access to the trailer, none of them has been shown to have given inconsistent statements to FedEx investigators, or have admitted to deliberately failing to alert supervisors that a box containing lottery ticket packets had been compromised.

Most importantly, however, the issue before the court is not Howell's ultimate guilt or innocence, but whether FedEx had a reasonable belief, based on Hamblin's interview, that Howell might have been involved in the lottery ticket theft. The court finds that such probable cause existed.

13

Finally, even if FedEx had initiated the criminal prosecution, and did so without probable cause. FedEx would still be entitled to summary judgment because Howell has failed to show that FedEx acted maliciously. In the context of a malicious prosecution claim, this means that the defendant "acted primarily for a purpose other than that of securing the proper adjudication of the claim upon which the proceedings are based." *Nelson v. Miller*, 227 Kan. 271, 276, 607 P.2d 438 (1980). A witness supplying information to police or prosecutor is responsible only where they give information which is "known by the giver to be false." *Arceo*, 182 F.Supp.2d at 1088. Howell has failed to present any evidence that FedEx acted within such knowledge or with an improper motive.

Finally, the court notes that plaintiff's claim includes damages for the termination of his employment. But the only remaining claims advanced by the plaintiff are for the allegedly outrage associated with the prosecution, or for the tort of malicious prosecution. Here, of course, the plaintiff was terminated immediately following Hamblin's investigation, and well before the supposedly wrongful prosecution. Under Kansas law, a plaintiff advancing a claim of malicious prosecution may recover for the harm "resulting" from the arrest or prosecution. *Nelson v. Miller*, 227 Kan. at 282. As a result, damages associated with the termination itself are not recoverable given the status of the remaining claims.


**B. Outrage**

Howell also alleges that FedEx subjected him to outrageous activity by intentionally inflicting emotional distress upon him. Such a claim requires proof (1) the defendant acted intentionally or in reckless disregard of the plaintiff's rights, (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and the plaintiff's mental distress; and (4) that mental distress must be extreme and severe. *Valadez v. Emmis Comm.*, 290 Kan. 472, 477 (2010).

The uncontroverted evidence does not support the conclusion that FedEx acted intentionally to harm Howell, or that it acted in reckless disregard of his rights. Rather, as discussed earlier, FedEx's investigator made a report to police which contained a complete copy of Howell's interview with the investigator. The contents of the interview and the circumstances of the case presented probable cause for a belief that Howell was involved in the loss of the missing lottery tickets. In forwarding a copy of the report, FedEx acted neither in intentional nor reckless disregard of Howell's rights, nor was its conduct extreme or outrageous.

Finally, the court finds that Howell has failed to demonstrate the level of damages required for the tort. "Elevated fright, continuing concern, embarrassment, worry and nervousness do not by themselves constitute sufficient harm to a plaintiff to warrant the award of damages for [the tort of] outrage." *Valadez v. Emmis Comm.*, 290 Kan. 472, 478, 229 P.3d 389 (2010). This is precisely what Howell has alleged here.

Howell alleges in his Complaint only that he suffered "significant mental pain, fright, humiliation, embarrassment and nervousness." (Amended Complaint, ¶ 28). On July 22, 2008, two months after his termination, Howell met with a physician in relation to custody proceedings, and the physician opined, "There's no evidence of mental illness or severe emotional disorder." (Plt. dep. 163) In his deposition, Howell testified, "I just really feel hurt on the inside." (Plf. dep. at 161). He testified that he had no history of depression, no suicidal thoughts, no problems with appetite or sleep, no problems with anxiety, no anger control difficulties, and no symptoms of any other type of psychological problems. Asked specifically if the statements he made in this regard were accurate, Howell responded, "Yes." (*Id*. at 165-166).

In response to FedEx's summary judgment motion, Howell now contends (Dkt. 45, at 52-53), for the first time, that he suffered from extreme fear of both going to jail and of losing custody of his son. Howell's pleading presents no rationale for offering such evidence by affidavit which directly contradicts his former deposition testimony, and the requested evidence is disregarded pursuant to *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).

15

IT IS ACCORDINGLY ORDERED this 14th day of October, 2011, that the defendant's Motion for Summary Judgment (Dkt. 41) is hereby granted.


s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

16